993 F.2d 1463
 143 L.R.R.M. (BNA) 2400, 125 Lab.Cas. P 10,739
 Stephen T. AGUINAGA; Wayne Pappan; Janet Brown,
individually and in behalf of all Union Members
similarly situated, Plaintiffs-Appellants,
v.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION;
United Food and Commercial Workers, Defendants-Appellees.
 Nos. 92-3091, 92-3093.
 United States Court of Appeals,
Tenth Circuit.
 May 19, 1993.
 
 Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, KS (Robert W. Coykendall, Morris, Laing, Evans, Brock & Kennedy, Chartered, Robert C. Brown, Patricia M. Dengler, Smith, Shay, Farmer & Wetta, with him on the brief), for plaintiffs-appellants.
 Laurence Gold, AFL-CIO Legal Dept., Washington, DC (Harry Huge, Steven K. Hoffman, Annette M. Capretta, Donovan Leisure, Rogovin, Huge & Schiller, Richard Roesel, United Food & Commercial Workers Intern. Union, with him on the brief), for defendants-appellees.
 Before TACHA, McWILLIAMS, and BALDOCK, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 This appeal arises from a hybrid breach of contract/unfair representation class action brought by 641 union members ("Plaintiffs") against their employer, John Morrell & Company ("Morrell"), the United Food and Commercial Workers International Union ("the Union"), and the Local Union 340, United Food and Commercial Workers ("the Local"), under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Plaintiffs alleged that Morrell breached several provisions of the 1979 collective bargaining agreement ("1979 Master Agreement") and that the Union and the Local breached their duty of fair representation in their response to Morrell's breaches. Morrell settled with Plaintiffs prior to trial and the Local was dismissed during the course of trial. The issue of the Union's liability was tried to a jury, and the jury returned a verdict in favor of Plaintiffs, finding that the Union breached its duty of fair representation. By agreement of the parties, the issue of damages was submitted to the court. After nearly two and one-half years, the court, based on the parties' briefs, entered final judgment against the Union, finding it liable to Plaintiffs in the amount of $4,730,869. Plaintiffs and the Union raise various issues on appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 I.
 
 2
 Plaintiffs are a class of former employees at an Arkansas City, Kansas meat packing plant operated by Morrell, that produced "Rodeo" brand meats ("the Rodeo Plant"). During their course of employment at the Rodeo Plant, Plaintiffs were members of the Union and the Local. As was common in the industry, the Union and Morrell negotiated a "Master Agreement" in 1979, to control the rights and obligations of employees at all Morrell facilities, including the Rodeo Plant. The 1979 Master Agreement was in effect until September 1, 1982 and from year to year thereafter unless proper notice was given.
 
 
 3
 Three provisions of the 1979 Master Agreement are at issue here. Section 10 of the 1979 Master Agreement prohibited Morrell from decreasing the work force for the purpose of avoiding any of the provisions of the 1979 Master Agreement. Section 100 placed restrictions on Morrell following the closing of a plant. Under Section 100, Morrell was prohibited from contracting with other plants located within one hundred miles of a closed plant to provide services formerly provided by a closed plant. This restriction would remain in effect during a five-year period following a plant closing. Section 101 provided the conditions under which a new company plant would be brought under the provisions of a Master Agreement in effect at the time of the plant opening. Section 101 only applied to plants opened in the "greater Midwest" and the "far West" regions of the country.
 
 
 4
 In May 1981, Morrell began issuing notices of closing to certain of its meat packing plants covered by the 1979 Master Agreement. Morrell represented these closings to be permanent. In December 1981, the Rodeo Plant became the fifth Morrell plant to receive a closing notice, with the effective date of closure scheduled for June 1982. By Spring 1982, Morrell had either closed or issued closing notices to seven of its ten plants.
 
 
 5
 In May 1982, as expiration of the initial term of the 1979 Master Agreement approached, the Union and Morrell met to begin new Master Agreement negotiations. In an effort to avoid the closure of several plants, the Union offered Morrell a concessionary package. Under the package, the Union offered, among other concessions, a three year wage freeze and suspension of all cost-of-living payments for the life of a new agreement. Morrell, however, rejected the Union's offer, and instead proposed changes in the Master Agreement whereby individual plants would be subject to separate wage and benefits packages. For the Rodeo Plant, Morrell proposed a forty percent cut in wages as well as cuts in benefits. The Rodeo Plant employees followed the Union's strong recommendations against the offer and voted to reject it.
 
 
 6
 As the time for the Rodeo Plant closing drew near, the Union, suspecting that Morrell might attempt direct negotiations with the Rodeo Plant Local, ordered the Local executive officer not to discuss any provisions of the Master Agreement with Morrell. Instead, the Union met again with Morrell officials in June 1982. However, nothing was achieved at that meeting and the Rodeo Plant was closed as scheduled on June 19, 1982. Pursuant to the 1979 Master Agreement, Plaintiffs received severance benefits upon closure of the plant.
 
 
 7
 In July 1982, negotiations between Morrell and the Union resumed. In August, Morrell offered what it termed a "final offer of settlement" which included the elimination of Sections 100 and 101 of the Master Agreement. The Union rejected the offer and Union representatives voted to authorize a strike at Morrell's Sioux Falls plant. Intervening negotiations failed, and, on September 1, 1982, the Sioux Falls workers went out on strike. Two days later, the Union distributed a handbill to the Sioux Falls workers that stated, "[o]n August 31st it became clear to us that Morrell wants [Sections] 100 and 101 eliminated because they intend to start operations at some or all of the closed plants." Appellant App. at 283.
 
 
 8
 Negotiations reconvened on September 7, 1982. On September 10, 1982, the parties signed a new Master Agreement, ending the Sioux Falls strike. In reaching agreement with Morrell, the Union entered into two secret side letter agreements. These side letter agreements, entered into on September 9, 1982 and September 10, 1982, affected the interpretation of Section 101 in the new Master Agreement. The September 9, 1982 letter provided that the plant located in Arkansas City, Kansas (the Rodeo Plant) "shall be included in the Southeast." Appellant App. at 295. The September 10, 1982 side letter specifically provided that "nothing in the Master Agreement executed today precludes [Morrell] from reopening previously closed plants located at ... Arkansas City, Kansas ... and that if such plants are reopened, no provision of said Master Agreement requires that such plants be subject to said Master Agreement." Appellant App. at 296. As a result of these two side letters, Morrell was allowed to reopen the Rodeo Plant as a nonunion plant without having to pay Master Agreement wages.
 
 
 9
 The Union failed to notify Plaintiffs of the existence or the content of the two side letter agreements. After hearing about the contents of the new Master Agreement from a Sioux Falls worker, the Rodeo Plant steward, a class member, contacted Union official John Mancuso. The steward asked Mancuso whether the Union agreed to let Morrell open the Rodeo Plant back up again. Mancuso's notes from the conversation state, "[t]his guy (the Rodeo Plant steward) kept asking if we (the Union) agreed with the company to let them reopen and I kept telling him we didn't." Appellant App. at 317.
 
 
 10
 In March 1983, Morrell reopened the Rodeo Plant facility as the Ark City Packing Company ("ACPC"). The Union notified Plaintiffs that "if it is established that [Morrell] violated the [Master Agreement], ... we will pursue through the National Labor Relations Board [ ("NLRB") ], any and all damages as a result of such violations." Appellant App. at 334. On March 29, 1983, the Union filed an unfair labor practice charge with the NLRB. The Union charged Morrell with failing to recognize the Union, failing to recall Union employees, and unilaterally changing the terms and conditions of employment upon reopening of the plant. However, in exchange for Morrell's agreeing to let the Union represent the workers of the reopened ACPC plant (formerly Rodeo Plant), the Union withdrew the unfair labor practice charge. The NLRB approved withdrawal of the charge in September 1983, and Plaintiffs instituted the present action in the same month.
 
 
 11
 After an eight-week trial on the issue of liability, the jury found that Morrell breached Section 10 and Section 100 of the 1979 Master Agreement.[1] The jury also found that the Union acted arbitrarily, discriminatively, or in bad faith by failing to protect Plaintiffs' rights with respect to Morrell's breaches. Furthermore, the jury concluded that Plaintiffs' claims against the Union were timely filed, and, with regard to Morrell's breach of Section 10 of the 1979 Master Agreement, the jury concluded that Plaintiffs were excused from exhausting their remedies. The Union filed a motion for judgement notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial. The court denied the motions.
 
 
 12
 The issue of damages was determined by the court. Following extensive briefing by the parties, the court determined that damages were to be assessed based on apportionment rather than joint and several liability. 720 F.Supp. 862. The court then apportioned damages based on proportionate fault. The court concluded that the Union was liable for twenty-five percent of Plaintiffs damages, and entered judgment against the Union in the amount of $4,730,869.
 
 
 13
 On appeal, Plaintiffs claim the district court erred in its calculation of damages. The Union cross appeals, claiming the court erred in denying its post-trial motions, and raising evidentiary issues relating to the court's damage award.
 
 II.
 
 14
 The Union appeals the district court's denial of its motion for JNOV, or in the alternative, for a new trial. The Union argues that the court erred in denying its post-trial motions with respect to Plaintiffs' claim that the Union breached its duty of fair representation regarding Morrell's breach of Section 10 of the 1979 Master Agreement. Specifically, the Union claims that: (1) the Union's conduct did not amount to a breach of duty, (2) Plaintiffs' failure to exhaust their contractual remedies was not excused, and (3) Plaintiffs' Section 10-related breach of duty claim against the Union was barred by the applicable statute of limitations.
 
 
 15
 In reviewing the denial of a motion for JNOV, we apply the same standard employed by the district court. Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). Under this standard, we review for "whether there is evidence upon which the jury could properly find a verdict for the party [against whom the motion is directed]." Id. (citing Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 498-99 (10th Cir.1984) (citation omitted)). In making this determination we view the evidence and inferences in the light most favorable to the nonmoving party. Id. A motion for JNOV is properly granted "only if the evidence points but one way and is susceptible to no reasonable inference which may support the opposing party's position." O.E.R., Inc. v. Hickerson, 880 F.2d 1178, 1180 (10th Cir.1989). We review the district court's denial of a motion for new trial for manifest abuse of discretion. Mason v. Texaco, Inc., 948 F.2d 1546, 1555 (10th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992).
 
 A.
 
 16
 We first address Plaintiffs' contention that the Union has waived its arguments on appeal because it failed to seek a directed verdict on the same grounds. Only those questions which have been raised in a prior motion for directed verdict may be pursued in a motion for JNOV. Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1251 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993). However, we liberally construe motions for directed verdict, and do not require technical precision as long as the trial court is aware of the movant's position. Anderson v. United Telephone Co., 933 F.2d 1500, 1504 (10th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 375, 116 L.Ed.2d 327 (1991).
 
 
 17
 In its motion for directed verdict, the Union argued that there was insufficient evidence to sustain a jury finding that the Union breached its duty of fair representation by entering into the 1982 side letters, or by withdrawing its unfair labor practice charge. In its motion for JNOV, the Union raised the same argument it raises here--i.e., that there was insufficient evidence to uphold the jury's verdict regarding a Section 10-related breach by the Union. Although Plaintiffs argue that the issues raised by the Union in its JNOV motion and on appeal are distinct from those issues raised by the Union in its motion for directed verdict, we hold that they are inextricably intertwined. Indeed, under Plaintiffs' theory of the case, the Union's Section 10-related breach of duty arose from the Union's entry into the two side letters and the Union's withdrawal of its unfair labor practice charge. Further, we are persuaded that the Union's motion for directed verdict put the court on sufficient notice that the Union was challenging Plaintiffs' Section 10-related breach of duty claim. In fact, upon the Union's motion for JNOV, the court below addressed the Union's challenges to Plaintiffs' Section 10-related breach of duty claim. Had the court deemed the Union's claims to be new issues not previously raised on directed verdict, the learned trial judge would not have addressed them.
 
 B.
 
 18
 The Union claims that there was insufficient evidence from which the jury could have concluded that the Union breached its duty of fair representation with respect to Morrell's breach of Section 10 of the 1979 Master Agreement. A union breaches its duty of fair representation if its conduct toward a member is "arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). A union's actions are arbitrary only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." Air Line Pilots Ass'n Int'l. v. O'Neill, 499 U.S. 65, ----, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991) (citation omitted). A union's discriminatory conduct violates its duty of fair representation if it is "invidious." Id. ----, 111 S.Ct. at 1137. Bad faith requires a showing of fraud, or deceitful or dishonest action. Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir.1992). The question, which the jury answered affirmatively here, was "did the Union act arbitrarily, discriminatively, or in bad faith with respect to Morrell's breach of Section 10 of the 1979 Master Agreement?" Appellee App. at 57 (emphasis added). Therefore, if the evidence supports a finding that the Union acted in any one of these three ways, the jury's verdict must be upheld. See Rajala, 919 F.2d at 615.
 
 
 19
 Viewed in the light most favorable to Plaintiffs, the evidence shows that, in August 1982, the Union knew of Morrell's plan to reopen the Rodeo Plant as a nonunion plant. Morrell's plan constituted a breach of Section 10 of the 1979 Master Agreement, yet the Union took no steps to remedy the breach. Instead, the Union entered into the two side letters with Morrell releasing all rights and claims Plaintiffs would have had against Morrell when the plant reopened. The Union then deceived Plaintiffs by concealing the side letters. As a result, Plaintiffs did not know that their rights had been sacrificed. Lastly, in an effort to conceal its acquiescence in Morrell's breach of Section 10, the Union filed an unfair labor practice charge against Morrell. However, after the NLRB decided to issue a complaint, the Union withdrew the charge and kept the withdrawal secret.
 
 
 20
 The Union's actions in sacrificing Plaintiffs' rights to recourse against Morrell for Morrell's breach of Section 10, and the Union's efforts to conceal its actions from Plaintiffs, support the jury's verdict against the Union. First, unlike O'Neill, this is not a case where union members are suing their union for its failure to strike a better deal through collective bargaining. See O'Neill, 499 U.S. at ----, 111 S.Ct. at 1130-32. Rather, this case involves the primary concern that the duty of fair representation was designed to address--i.e., the concern that individual employees not be deprived of all effective means of protecting their own interests. Delcostello v. International Bhd. of Teamsters, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 2291 n. 14, 76 L.Ed.2d 476 (1983). Here, the Union not only failed to protect Plaintiffs' interests, it bartered away Plaintiffs' means of protecting themselves and left Plaintiffs without representation. Such deliberate abandonment of Plaintiffs' interests constitutes wrongdoing on the part of the Union, see Bennett v. Local Union No. 66, 958 F.2d 1429, 1437-38 (7th Cir.1992), and the record contains sufficient evidence to find that this activity was irrational in light of the surrounding climate. Further, the Union's attempts to conceal its activities from Plaintiffs support a finding of bad faith on the part of the Union. O'Neill v. ALPA, 939 F.2d 1199, 1202-03 (5th Cir.1991) (bad faith shown by evidence of intentionally misleading or egregious misstatements by union).
 
 
 21
 Moreover, if, as the Union argues, O'Neill counsels that the Union be accorded due deference in its decision to sacrifice Plaintiffs' rights, such deference would only be appropriate insofar as the Union's motive had been proper--i.e., to gain advantage with Morrell in bargaining over other Morrell plants. See 499 U.S. at ----, 111 S.Ct. at 1135 (examination of union's performance must be highly deferential recognizing wide latitude negotiators need to perform bargaining responsibilities). Here, however, Plaintiffs presented evidence that the Union had other motives in sacrificing Plaintiffs' rights and concealing its activities. The record contains evidence that tended to show that the Union was motivated in part by its desire to obtain status as the bargaining representative for the reopened ACPC plant (formerly Rodeo Plant) employees at the expense of the former Rodeo Plant employees, or because of Union dislike of Local officials. As neither of these motives are proper for a union which has a duty to its members "akin to the duty owed by other fiduciaries to their beneficiaries," id. at ----, 111 S.Ct. at 1134, we hold that there is evidence upon which the jury could properly find that the Union breached its duty of fair representation. See Ooley v. Schwitzer Div., Household Mfg. Inc., 961 F.2d 1293, 1303 (7th Cir.) (breach of duty for union to sacrifice individual's rights to protect itself), cert. denied, --- U.S. ----, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992); Bennett, 958 F.2d at 1436-39 (union may not trade away individual's rights based on internal union politics); Shatto v. Evans Products Co., 728 F.2d 1224, 1227 (9th Cir.1984) (union prohibited from trading away individual's vested contractual rights without individual's consent); Harrison v. United Transportation Union, 530 F.2d 558 (4th Cir.1975) (union prohibited from sacrificing individual's grievance rights to further union's own institutional interests), cert. denied, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).
 
 C.
 
 22
 The Union claims that there was insufficient evidence whereby the jury could have concluded that Plaintiffs were excused from exhausting their contractual remedies. The Union claims that because there was no evidence that the Local breached its duty of fair representation, Plaintiffs were not excused from pursuing a grievance through the Local.
 
 
 23
 An employee can bring suit under § 301 of the LMRA only if he or she has exhausted the contractual remedies provided in the collective bargaining agreements. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976). However, where the right to invoke the advanced stages of the contractual remedy process rests with the union, proof that the union breached its duty of fair representation in its response to an employer's contract breach is an exception to the requirement of exhaustion. See Vaca, 386 U.S. at 185-86, 87 S.Ct. at 914-15; United Food & Commercial Workers Local 7R v. Safeway Stores, Inc., 889 F.2d 940, 945 (10th Cir.1989). In such instance, the union has effectively ceased to function as the employee's representative. United Food & Commercial Workers, 889 F.2d at 945.
 
 
 24
 Under the 1979 Master Agreement, an individual employee could initiate the grievance procedure, but the later stages of the grievance process required union participation. Although the local unions generally had primary responsibility for enforcing the 1979 Master Agreement, the evidence supports a finding that in the case of Morrell's Section 10 breach, the Union, not the Local, assumed control over the matter. Upon the reopening of ACPC, the Union reassured Plaintiffs that if Morrell had violated the 1979 Master Agreement, the Union, not the Local, would seek to remedy the violation. Therefore, in determining whether Plaintiffs are required to exhaust, the relevant inquiry is whether the Union, not the Local, breached its duty of fair representation. As set out supra part II.B, Plaintiffs successfully proved that the Union breached its duty of fair representation by refusing to protect Plaintiffs' interests in the face of Morrell's Section 10 breach. Plaintiffs were therefore not required to exhaust; accordingly, the jury's finding that Plaintiffs' failure to exhaust was excused is reasonable.
 
 D.
 
 25
 The Union claims that the jury lacked sufficient evidence to conclude that Plaintiffs' Section 10-related breach of duty claim against the Union was not barred by the applicable statute of limitations. The Union argues that certain members of the Plaintiff class were aware of the Union's acts constituting the Union's breach of duty in September 1982, and Plaintiffs' action is therefore barred because it was not commenced within six months.
 
 
 26
 Hybrid suits under § 301 of the LMRA are subject to the six-month statute of limitations prescribed by 29 U.S.C. § 160(b). Delcostello, 462 U.S. at 154-55, 103 S.Ct. at 2285-86. A hybrid suit is untimely if the plaintiff knew or should have known of the acts constituting the union's alleged violation more than six months before the action was commenced. Lucas v. Mountain States Tel. & Tel., 909 F.2d 419, 421-22 (10th Cir.1990). Whether an action is timely is a question for the jury to decide applying a preponderance of the evidence standard. State of Ohio v. Peterson, Lowry, Rall, Barber & Ross, 651 F.2d 687, 695 (10th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981).
 
 
 27
 The Union's Section 10-related breach of duty of fair representation arose from two activities on the part of the Union: (1) the Union's withdrawal of its unfair labor practice charge, and (2) the Union's entry into the September 9 and 10, 1982 side letters. See supra part II.A. There is no question that Plaintiffs instituted this action well within six months of learning of the Union's decision to withdraw its unfair labor practice charge. The earliest possible date that Plaintiffs knew or should have known of the Union's request to withdraw the charge was June 1983 when the Union announced its plan to request withdrawal to the ACPC employees, and Plaintiffs filed this action in September 1983. The only issue, then, is whether Plaintiffs knew or should have known of the Union's entry into the side letters more than six months prior to commencing suit.
 
 
 28
 Viewing the evidence in the light most favorable to Plaintiffs, see Rajala, 919 F.2d at 615, the jury properly determined that Plaintiffs suit was timely. The Union kept the side letters, which allowed Morrell to reopen the Rodeo Plant free from the 1979 Master Agreement, secret from Plaintiffs. The Union now argues that the Rodeo Plant steward, a class member, learned of the substance of the side letters in September 1982. However, the evidence shows that the steward contacted Union official Mancuso about his suspicions concerning the secret side letters, and was reassured by Mancuso that the Union had not, in fact, agreed to allow Morrell to reopen the Rodeo Plant. Then, upon Morrell's reopening of the plant, the Union reassured Plaintiffs that it would investigate whether Morrell had violated the Master Agreement by reopening the plant, and, in March 1983, the Union filed an unfair labor practice charge with the NLRB. These actions by the Union lulled Plaintiffs into believing that the Union was protecting their rights. See, e.g., Rucker v. St. Louis Southwestern Ry. Co., 917 F.2d 1233, 1238 (10th Cir.1990). As a result, the jury could have reasonably concluded that Plaintiffs did not know, nor should have known, of the Union's violation of their rights prior to the Union's sealing of Plaintiffs' fate by withdrawing its unfair labor practice charge in July 1983.
 
 
 29
 In sum, we conclude that the district court did not err in denying the Union's motion for JNOV. We further conclude that the court did not abuse its discretion in denying the Union's alternative motion for new trial.
 
 III.
 
 30
 The Union and Plaintiffs present issues on appeal relating to the damages phase of the trial below. The Union claims that the district court erred by refusing the Union's request to present evidence demonstrating: (1) that Morrell would have decreased the Rodeo Plant work force even if no breaches had occurred, and (2) that Plaintiffs failed to mitigate damages. Plaintiffs claim the district court committed errors relating to the calculation of damages. Specifically, Plaintiffs claim that the court erred by: (1) failing to impose joint and several liability, (2) arbitrarily apportioning damages on a proportionate fault basis, and (3) limiting the period of damages to fifteen months.
 
 A.
 
 31
 The damages issue was submitted to the court, and the court entered judgment on the briefs. The Union sought to introduce evidence that, even in the absence of any breaches by Morrell or the Union, Morrell would have eventually reduced the Rodeo Plant work force. The Union sought to use such evidence to establish that not all members of Plaintiff class--i.e., no more than three hundred Rodeo employees--are entitled to back pay and benefits for the entire damages period. Initially, the court ruled that the Union would be permitted to introduce such evidence; however, the court later reversed itself finding that the issue of whether Morrell would have reduced the Rodeo Plant work force for economic reasons had already been presented to and rejected by the jury. We review the district court's exclusion of evidence for an abuse of discretion. Thweatt v. Ontko, 814 F.2d 1466, 1470 (10th Cir.1987).
 
 
 32
 The purpose of a back pay award is to make the employee whole--i.e., restore the economic status quo that would have obtained but for the wrongdoing on the part of the employer and the union. See Bowen v. United States Postal Serv., 459 U.S. 212, 222-23, 103 S.Ct. 588, 594-95, 74 L.Ed.2d 402 (1983); NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969). It is improper, however, to award back pay if it can be shown that the employees would have lost their jobs at a later date even if they had been treated fairly. NLRB v. Master Slack and/or Master Trousers, 773 F.2d 77, 83 (6th Cir.1985). The burden is on the defendant to prove by a preponderance of the evidence that an employee would have been discharged or laid off at a later date, or that the employee's job would have been phased out, even if no breach of contract and breach of duty of fair representation had occurred, see id.; NLRB v. C.R. Adams Trucking, Inc., 767 F.2d 1276, 1277 (8th Cir.1985); M.S.P. Indus., Inc. v. NLRB, 568 F.2d 166, 180 (10th Cir.1977), and the defendant has a right to present such evidence in defending a claim for damages. M.S.P. Indus., 568 F.2d at 180. However, the defendant does not have a right to relitigate, at the damages phase, an issue he or she has already litigated and lost at the liability phase. See Monfort, Inc. v. NLRB, 965 F.2d 1538, 1546-47 (10th Cir.1992) (no relitigation of issue at compliance phase of NLRB hearing (when back pay determinations made) where issue already litigated and lost at proceeding on the merits).
 
 
 33
 After a careful review of the record, we hold that the district court abused its discretion in refusing to allow the Union to present evidence that Morrell would have decreased the Rodeo work force even in the absence of the breaches by Morrell and the Union. The only arguably related evidence presented by the Union at the liability phase of the trial was generalized information regarding the state of the meat packing industry in the late 1970's and early 1980's. The Union introduced this evidence solely to try to establish that it was reasonable for the Union to believe that Morrell's closing of the Rodeo Plant was permanent. The Union introduced no evidence at all that Morrell would have, absent any breaches, eventually discharged or laid off employees, or phased out jobs at the Rodeo Plant. Therefore, the district court erred in its determination that the issue had already been litigated and decided by the jury. Because the court's error deprived the Union of an opportunity to present any evidence on an issue it was entitled to raise and on which it had the burden of proof, the court has abused its discretion. See Monroe Div., Litton Business Sys., Inc. v. De Bari, 562 F.2d 30, 33 (10th Cir.1977) (due process violated where defendant denied opportunity to present damages evidence). Accordingly, we remand to the district court with instructions to allow the Union the opportunity to present its evidence that Morrell would have, absent any breaches, decreased its Rodeo Plant work force to no more than three hundred employees.
 
 B.
 
 34
 The Union contends that the district court erred by not allowing it to interview each class member concerning his or her individual mitigation efforts. We review for abuse of discretion. See Thweatt, 814 F.2d at 1470.
 
 
 35
 Employees claiming entitlement to back pay and benefits are required to make reasonable efforts to mitigate damages. EEOC v. Sandia Corp., 639 F.2d 600, 627 (10th Cir.1980). Once back pay and benefits have been awarded, the burden is on the employer to show that the claimant did not exercise reasonable diligence in mitigating his or her damages. Id. To satisfy this burden, the employer must establish that: (1) there were suitable positions which the claimants could have discovered and for which they were qualified, and (2) the claimants failed to use reasonable diligence in seeking such positions. Id. (citation omitted).
 
 
 36
 In order to satisfy its burden, the Union was required to satisfy both prongs of the above two-part test. The Union failed its burden of establishing the first prong--i.e., that suitable positions were available for any of the Plaintiffs. Because it failed this prong of its burden, the Union has failed its burden of proof and evidence that supports the second prong of the test-- i.e., the individual mitigation efforts of Plaintiffs--are simply irrelevant. We therefore hold that the district court did not abuse its discretion in refusing the Union's request to interview class members regarding their individual mitigation effort.
 
 C.
 
 37
 Plaintiffs claim that the court erred by apportioning damages between the Union and Morrell, instead of imposing joint and several liability. Plaintiffs argue that the Union caused or participated in Morrell's breaches of the 1979 Master Agreement, justifying imposition of joint and several liability. We review the court's legal conclusions de novo, and the court's factual determination of the amount of damages under the clearly erroneous standard. Chaparral Resources, Inc. v. Monsanto Co., 849 F.2d 1286, 1289 (10th Cir.1988).
 
 
 38
 In hybrid § 301 cases, "[t]he governing principle [ ] is to apportion liability between the employer and the union according to the damage cause by the fault of each." Vaca v. Sipes, 386 U.S. 171, 197, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1966). "[D]amages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer." Id. at 197-98, 87 S.Ct. at 920-21. The general rule that damages are to be apportioned between the employer and the union may not apply in situations where a union affirmatively caused the employer to commit the contract breach, or where the union and the employer actively participated in the other's breach. Id. at 197 n. 18, 87 S.Ct. at 920 n. 18; see also Bennett v. Local Union No. 66, 958 F.2d 1429, 1440 (7th Cir.1992). Rather, these situations may warrant the imposition of joint and several liability. See Bennett, 958 F.2d at 1440; Bowen, 459 U.S. 212, 103 S.Ct. 588; see also Baskin v. Hawley, 807 F.2d 1120 (2d Cir.1986) (holding that imposition of joint and several liability was not plain error when union participated in underlying wrongs).
 
 
 39
 The district court found that, no later than December 1981, Morrell had formulated a secret scheme to close the plant, purportedly permanently, and reopen it nonunion at a later time. Once implemented, this scheme violated the 1979 Master Agreement. Morrell was the sole initiator of this plan, and there was no evidence that the Union played a role in or had knowledge of Morrell's plan until August 1982, or, at the latest, September 1982. Upon learning of Morrell's scheme, the Union breached its duty to Plaintiffs by failing to remedy Morrell's breach of the 1979 Master Agreement, and by acquiescing in Morrell's plan as evidenced by the Union's entry into the September side letter agreements.
 
 
 40
 Given these findings, the Union did not cause or participate in Morrell's contract breach. Morrell's breach--i.e., the sham closing of the Rodeo Plant--was accomplished in June 1982. The Union did not learn of the breach until after the sham closing, and any wrongdoing on its part constituted a post facto failure to remedy Morrell's breach, not an inducement to or participation in that breach. The Union's conduct is similar to that of a union that fails to process a meritorious grievance in the typical hybrid § 301 suit. Because this is not the extraordinary case where the union caused the employer's breach or where the union and the employer participated in each other's breach, the court correctly determined that joint and several liability was inappropriate, and the general rule of apportionment applies.
 
 D.
 
 41
 Plaintiffs also contend that the district court arbitrarily apportioned damages between the Union and Morrell. Plaintiffs claim is two-fold: (1) that the court erred in apportioning damages based on proportionate fault, and (2) that the court's assignment of fault was arbitrary.
 
 1.
 
 42
 Under Vaca, liability for damages in hybrid § 301 claims must be apportioned between the employer and the union "according to the damage caused by the fault of each." 386 U.S. at 197, 87 S.Ct. at 920. Applying this principle in Bowen, the Supreme Court held that a union can be liable for back pay and benefits because the union's fault "requires [it] to bear some responsibility for increases in the employee's damages resulting from [the union's] breach." 459 U.S. 212, 222, 103 S.Ct. 588, 595. The Bowen Court also let stand a lower court apportionment of back pay between the employer and the union on a strictly chronological basis. Id. Under the lower court's formula, the employer was liable for back pay during the six months between the wrongful discharge date and the hypothetical date upon which the plaintiff would have been reinstated had the union not breached its duty of fair representation. Id. at 215-17, 103 S.Ct. at 591-92. The union was held accountable for back pay from the hypothetical arbitration date until the date of the jury verdict. Id. Plaintiffs argue that Bowen mandates such a chronological method of apportionment based on the hypothetical arbitration date.
 
 
 43
 We do not agree that Bowen requires that damages be apportioned based on chronology using the hypothetical arbitration date. First, the Bowen Court narrowly framed the issue as "whether a union may be held primarily liable for that part of a wrongfully discharged employee's damages caused by his union's breach of its duty of fair representation." Id. at 214, 103 S.Ct. at 590. Finding the employee's right to be made whole of paramount importance, the Court rejected the union's argument that it could not be held liable for any back pay. Id. at 219-20, 103 S.Ct. at 593. We read Bowen to simply hold that in order to make an employee whole, a union can be held liable for back pay to the extent the union caused the employee to suffer the lost wages.
 
 
 44
 The lower court's method of apportionment, or any particular method of apportionment, was not, however, before the Bowen Court for review. The lower court had instructed the jury that the issue of how to apportion damages between an employer and a union was left to its discretion. Id. at 215, 103 S.Ct. at 591. The Bowen lower court also indicated to the jury that it could base apportionment on the date of a hypothetical arbitration decision. Id. Although the Supreme Court let the jury verdict stand, it specifically stated that it was not deciding whether the lower court's instructions on apportionment of damages were proper. Id. at 230 n. 19, 103 S.Ct. at 599 n. 19. Moreover, the Court expressly reserved the issue of apportionment on the basis of fault, as both the employer and the union in Bowen were found to be equally culpable. Id.
 
 
 45
 Having determined that Bowen does not require the application of a chronological method of apportionment based on a hypothetical arbitration date, we must now determine whether the district court's application of a proportionate fault formula was proper. As a starting point, we recognize that suits under § 301 of the LMRA are governed by federal common law. Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957). In other areas in which federal common law applies, we have used a proportionate fault formula to apportion damages among two or more wrongdoers. See e.g., United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (maritime collision actions); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (admiralty personal injury actions). Liability based on proportionate fault has also been provided for, in certain instances, by Congress, see e.g., Merchant Marine (Jones) Act, 38 Stat. 1185, as amended, 41 Stat. 1007, 46 U.S.C. App. § 688; Death on the High Seas Act, 41 Stat. 537, 46 U.S.C. App. § 766; Federal Employers' Liability Act, 35 Stat. 66, 45 U.S.C. § 53. Therefore, so long as the district court's application of a proportionate fault formula adequately advances the principles announced in Vaca and Bowen, we will uphold the district court's apportionment according to fault in this § 301 hybrid case.
 
 
 46
 Under Vaca and Bowen, the apportionment of damages between an employer and a union, in a hybrid § 301 case, must serve the following purposes: (1) damages must be apportioned according to each party's fault, Vaca, 386 U.S. at 197-98, 87 S.Ct. at 920-21, (2) the union must be held responsible for any increases in the employee's damages, which were caused by the union, Bowen, 459 U.S. at 222, 103 S.Ct. at 594, and (3) the employee must be made whole, id. at 219-20, 103 S.Ct. at 592-93. In serving these purposes, we also note that "[t]he appropriate remedy for a breach of a union's duty of fair representation must vary with the circumstances of the particular breach." Vaca, 386 U.S. at 195, 87 S.Ct. at 919.
 
 
 47
 We hold that the district court's apportionment of damages between Morrell and the Union based on proportionate fault in this hybrid § 301 case was proper. Apportioning damages based on proportionate fault, by definition, necessarily serves Vaca 's overriding purpose of apportioning "according to the damage caused by the fault of each." Id. at 197, 87 S.Ct. at 920. Here, by using a proportionate fault method as opposed to the hypothetical arbitration date method, the court was able to apportion the majority of the damages to the primary wrongdoer, Morrell. If, on the other hand, the court was forced to apply the hypothetical arbitration date method, the majority of the back pay and benefits awarded may have been assessed against the Union even though the court found that the Union did not initiate the wrongful conduct and was not the primary wrongdoer. Further, the court's fault-based apportionment also served the Bowen principle that the union be held responsible for any increases in the employee's damages solely attributable to the union's breach. Of this we are convinced because the court specified that its apportionment took into account the time frames of both a hypothetical arbitration date and the 1979 Master Agreement. Accounting for these time frames implies that the court properly considered the Union's responsibility for delaying Plaintiffs' remedy. We also hold that the court's application of a proportionate fault method of apportionment served to make Plaintiffs whole because all of Plaintiffs' damages were assessed against either Morrell or the Union.[2]
 
 
 48
 In sum, we are not saying that the proportionate fault method of apportioning damages is always superior to the hypothetical arbitration date method in a hybrid § 301 case. Rather, we hold that the hypothetical arbitration date method is not required in every hybrid case, and we hold that under the circumstances of this "sham closing" breach of contract/breach of fiduciary duty case, apportionment of damages based on proportionate fault was proper.
 
 2.
 
 49
 Plaintiffs also contend that the district court's allocation of responsibility for seventy-five percent of the damages against Morrell and twenty-five percent against the Union was arbitrary. We review for clear error. Chaparral Resources, Inc., 849 F.2d at 1289.
 
 
 50
 In apportioning damages, the court expressly found that "the evidence at trial [ ] indicated that Morrell was the initial and primary wrongdoer." Appellant App. at 166. Based on that finding, the court determined that it would be appropriate to apportion over half of the damages to Morrell. Moreover, in the court's view of all of the evidence, the seventy-five/twenty-five apportionment was most consistent with the hypothetical time frame of an arbitration decision and the duration provision of the 1979 Master Agreement. Plaintiffs have presented no evidence that these findings were clearly erroneous, we therefore uphold the district court's decision to apportion seventy-five percent of the damages to Morrell and twenty-five percent to the Union.
 
 E.
 
 51
 Finally, we address Plaintiffs' claim that the district court erred by limiting the period of damages to fifteen months. The district court held that damages were to be awarded from the date of the closing of the Rodeo Plant until September 1, 1983. Plaintiffs claim that to be made whole, the period of damages must run until February 17, 1987--the date that the settlement between Plaintiffs and Morrell was approved by the court.[3] Although we review the court's factual determination of the amount of damages under the clearly erroneous standard, "[w]e are not so constrained ... when the trial court's computation of damages is predicated on a misconception of the governing rule of law." Chaparral Resources, Inc., 849 F.2d at 1289.
 
 
 52
 In determining the time period for damages, the district court stated that damages in this case must have a basis in the 1979 Master Agreement. The court found that the 1979 Master Agreement did not terminate on September 1, 1982--the specified contract termination date--because Morrell's notice to the Union of its intent to terminate was invalid. The notice was invalid, the court found, because the notice was integral to Morrell's deceitful and fraudulent plan to close and reopen the Rodeo Plant. The court further found that, by the terms of the 1979 Master Agreement, if proper notice was not received by the Union, the contract continued to run from year to year until proper notice was given. Under this provision, the court awarded damages until September 1, 1983.
 
 
 53
 In Bowen, the Supreme Court recognized that principles of ordinary contract law do not necessarily govern the apportionment of damages in hybrid § 301 cases. 459 U.S. at 220, 224, 103 S.Ct. at 593, 595. First, the union's duty of fair representation is statutory, not contractual. See Vaca, 386 U.S. at 177, 87 S.Ct. at 910. Moreover, collective bargaining agreements are much more than simple contracts of hire. Id. 459 U.S. at 220, 103 S.Ct. at 593. "For, as the Court has noted, a collective bargaining agreement 'is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.' " Id. (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1350, 4 L.Ed.2d 1409 (1960)). A collective bargaining agreement creates relationships and interests as defined by the federal common law of national labor policy. Id. In hybrid § 301 cases, "[o]f paramount importance is the right of the employee, who has been injured by both the employer's and the union's breach, to be made whole." Bowen, 459 U.S. at 222, 103 S.Ct. at 595; see also International Bhd. of Elec. Workers v. Foust, 442 U.S. 42, 48-49, 99 S.Ct. 2121, 2126, 60 L.Ed.2d 698 (1979) ("[t]he fundamental purpose of unfair representation suits is to compensate for injuries caused by violations of employees' rights").
 
 
 54
 Federal courts, in furtherance of our national labor policy, have taken an expansive approach, where appropriate, to damages and remedies for breach of a collective bargaining agreement. See e.g., District 17 v. Allied Corp., 765 F.2d 412, 419-20 (4th Cir.) (en banc) (injunction issued requiring employer that breached collective bargaining agreement to continue to pay retired miners benefits), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985); Richardson v. Communications Workers of America, 443 F.2d 974 (8th Cir.1971) (wrongfully discharged employee entitled to back pay beyond expiration date of collective bargaining agreement); Local 127, United Shoe Workers v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3d Cir.1962) (en banc) (damage award against union calculated on basis of hypothetical contract renewals for twenty years).
 
 
 55
 In Richardson, an employee brought a hybrid § 301 suit against his employer and union. 443 F.2d at 976-78. Upon a verdict for the employee against the employer, the district court reduced the amount of damages so that the employee's back pay award terminated with the expiration date of the collective bargaining agreement. Id. at 978. The Eighth Circuit reversed, holding that the employee was entitled to back pay extending beyond the expiration date of the agreement. The court reasoned that although the claim against the employer arose out of the collective bargaining agreement, "the terms of the agreement do not create the job and that no specific obligation to hire flows from it." Id. Recognizing that the collective bargaining agreement is not an ordinary contract, the court continued:
 
 
 56
 The employment relationships which arise under it do not exist separate from it in a vacuum totally void of other relevant circumstances. The expiration date of a bargaining contract does not place the employee in jeopardy of losing his job at the termination of the agreement. In fact one of the very incentives to union representation is job security. The employee, the union which represents him, the company which employs him, each contemplate a 'subsisting' contractual relationship for an indefinite period of time. (citations omitted) This is particularly true in established industries where continual dealings with a recognized union foster renewals and renegotiations.
 
 
 57
 Id. at 978-79. Finding a strong likelihood of the employee's future employment, and the probability of the renewal of the collective bargaining agreement, the court concluded that it was error for the district court to have limited damages by the expiration date of the agreement. Id. at 979-80.
 
 
 58
 Given the above principles, we believe the court erred when it limited Plaintiffs' damages to fifteen months. First, in determining when Plaintiffs right to back pay and benefits terminated, we feel the court placed undue emphasis on the expiration date of the 1979 Master Agreement. Although the court alluded that it had discretion concerning the time period for damages, the court went to great lengths to tie the ending date of damages to the 1979 Master Agreement. We believe the court proceeded in this fashion because it was under the mistaken belief that general contract principles must govern the determination of the damages period. Because the court's computation of damages is predicated on a misconception of the governing rule of law, we will therefore not constrain ourselves to reviewing for clear error. See Chaparral, 849 F.2d at 1289.
 
 
 59
 Applying a more stringent review, we determine that the district court's limitation of damages to fifteen months does not serve to make Plaintiffs whole. Absent Morrell's sham closing and the Union's breach of duty, Plaintiffs were not in jeopardy of losing their jobs simply because the 1979 Master Agreement was terminated. Rather, Morrell and the Union have had a long-standing relationship, and over the years they have continued to negotiate Master Agreements. Like the parties in Richardson, Plaintiffs, Morrell, and the Union each contemplated a continued contractual relationship between the expiration of one Master Agreement and the negotiation of the next. Also, as in Richardson, the likelihood of Plaintiffs' future employment with Morrell beyond the expiration of the 1979 Master Agreement was strong. As the jury found, Morrell would have not have closed the profitable Rodeo Plant absent bad motive, and furthermore, Morrell reopened the plant as ACPC within the year. Finally, we have persuasive evidence that a collective bargaining agreement between Morrell and the Union beyond the 1979 Master Agreement was likely, for here Morrell and the Union entered into a new Master Agreement in 1982. All of these factors tend to show that, absent Morrell's sham closing and the Union's breach, Plaintiffs would have enjoyed continued employment at the Rodeo Plant beyond the expiration of the 1979 Master Agreement, and therefore, limiting Plaintiffs' damages to September 1983 (the district court's factual determination of the date of the 1979 Master Agreement's expiration) will not make them whole.
 
 
 60
 Instead, we hold that in this hybrid § 301 case, damages must be awarded to Plaintiffs from the date of the Rodeo Plant closing until February 17, 1987--the date that the settlement between Plaintiffs and Morrell was approved by the court. Back pay liability normally runs until the employer makes a valid, unconditional reinstatement offer. NLRB v. Louton, Inc., 822 F.2d 412, 415 (3d Cir.1987). A back pay claimant who rejects a valid reinstatement offer is therefore not entitled to back pay for the period after the rejection of the offer. NLRB v. Betts Baking Co., 428 F.2d 156 (10th Cir.1970). In the same manner, a waiver of all rights to reinstatement via a settlement with the employer operates to cut off all liability for back pay. See Foust v. International Bhd. of Elec. Workers, 572 F.2d 710 (10th Cir.1978) (damages awarded in hybrid § 301 case from date of discharge until date plaintiff settled with his employer and waived reinstatement), rev'd in part on other grounds, 442 U.S. 42, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979). Applying this general rule of awarding back pay and benefits until rejection of an offer of reinstatement is the only way Plaintiffs can be made whole--i.e., put in the same position as if Morrell had not breached the 1979 Master Agreement and the Union had not breached its duty of fair representation.[4] Accordingly, we remand to the district court for calculation of Plaintiffs' damages from June 19, 1982 until February 18, 1987.[5]
 
 IV. CONCLUSION
 
 61
 The district court's denial of the Union's motion for JNOV, or in the alternative, for new trial is AFFIRMED. The district court's judgment as to damages is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 A hybrid action under § 301 of the LMRA involves two claims: (1) that the employer breached the collective bargaining agreement, and (2) that the union breached its duty of fair representation. Delcostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-65, 103 S.Ct. 2281, 2290-91, 76 L.Ed.2d 476 (1983). The plaintiff must prove both breaches in order to prevail. Id. Therefore, although Morrell had already settled with Plaintiffs prior to trial, Plaintiffs were still required to prove that Morrell breached the 1979 Master Agreement in order to prevail against the Union
 
 
 [2]
 However, Plaintiffs' previous settlement with Morrell ultimately diminished their back pay award
 
 
 [3]
 Plaintiffs also contend that Section 100 of the 1979 Master Agreement contemplated damages for a five year term. We agree with the district court's determination that damages under this provision are subsumed in the damages to be awarded for Morrell's and the Union's Section 10-related breach. Therefore, the Section 100 provision cited by Plaintiffs does not extend the damages period
 
 
 [4]
 We find the Union's reliance on International Bhd. of Elec. Workers v. A-1 Elec. Serv., 535 F.2d 1 (10th Cir.), cert. denied, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976), unpersuasive. A-1 Elec. was not a hybrid § 301 case; rather, it was a breach of contract action by a union against an employer. In A-1 Elec., we extended an award of damages so that the award terminated with the expiration of the collective bargaining agreement. 535 F.2d at 4. In doing so, we expressly determined that we were exercising our "power ... under section 301(a) to fashion a remedy that encourages the [national labor policy of] enforcement of collective bargaining agreements." Id. at 3. Likewise here, our holding furthers the policy of making the aggrieved employee in a hybrid § 301 suit whole
 
 
 [5]
 Of course, the determination of Plaintiffs' damages is subject to our holding supra part III.A, that the Union must be given an opportunity to present evidence that not all members of Plaintiff class would have retained their jobs even in the absence of breaches by Morrell and the Union