58 F.3d 513
 149 L.R.R.M. (BNA) 2595, 130 Lab.Cas. P 11,388
 Stephen T. AGUINAGA, Wayne Pappan, Janet Brown, individually
and on behalf of all other Union members similarly
situated, Plaintiffs-Appellees,
v.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
Defendant-Appellant.
 Nos. 94-3154, 94-3208.
 United States Court of Appeals,
Tenth Circuit.
 June 13, 1995.
 
 Ken M. Peterson (Robert W. Coykendall of Morris, Laing, Evans, Brock & Kennedy and Robert C. Brown and Patricia M. Dengler of Brown, Dengler, Good & Rider, L.C. with him on the brief), Wichita, KS, for plaintiffs-appellees.
 Steven K. Hoffman of Guerrieri, Edmond & James (Richard Roesel of United Food and Commercial Workers Intern. Union with him on the brief), Washington, DC, for defendant-appellant.
 Before EBEL, Circuit Judge, BRIGHT* and McWILLIAMS, Senior Circuit Judges.
 BRIGHT, Senior Circuit Judge.
 
 I. Introduction
 
 1
 We now consider the third appeal in this action arising from a hybrid breach of contract/unfair representation class action brought by 641 union members ("Plaintiffs") against their employer, John Morrell & Company ("Morrell"), the United Food and Commercial Workers International Union, AFL-CIO/CLC ("the Union"), and the Local Union 340, United Food and Commercial Workers ("the Local"), under Sec. 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185.
 
 
 2
 Plaintiffs alleged that Morrell breached several provisions of the 1979 collective bargaining agreement and that the Union and the Local breached their duty of fair representation in their response to Morrell's breaches. Morrell settled with Plaintiffs prior to trial and the Local was dismissed during the course of trial. The issue of the Union's liability was tried to a jury, and the jury returned a verdict in favor of Plaintiffs, finding that Morrell had violated two provisions of the 1979 Master Agreement and that the Union breached its duty of fair representation by failing to protect the Plaintiffs' rights. By agreement of the parties, the issue of damages was submitted to the district court, which eventually entered judgment against the Union in the amount of $4,730,869.
 
 
 3
 Both parties cross-appealed the district court's initial judgment as to liability and damages.[1] We affirmed the liability issues and the district court's method of apportioning damages, but reversed the district court's judgment as to damages, and remanded for further proceedings. Aguinaga v. United Food and Commercial Workers Int'l Union, 993 F.2d 1463 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994) ("Aguinaga I "). Pursuant to our remand order, the district court conducted a rehearing on the back pay and related damages and fixed damages due the Plaintiffs from the Union at $13,739,612. The Union now appeals this damage judgment.
 
 II. Background
 
 4
 We revisit the facts as first set forth in Aguinaga I, 993 F.2d at 1467-69:
 
 
 5
 Plaintiffs are a class of former employees at an Arkansas City, Kansas meat packing plant operated by Morrell, that produced "Rodeo" brand meats ("the Rodeo Plant"). During their course of employment at the Rodeo Plant, Plaintiffs were members of the Union and the Local. As was common in the industry, the Union and Morrell negotiated a "Master Agreement" in 1979, to control the rights and obligations of employees at all Morrell facilities, including the Rodeo Plant. The 1979 Master Agreement was in effect until September 1, 1982 and from year to year thereafter unless proper notice was given.
 
 
 6
 ... Section 10 of the 1979 Master Agreement prohibited Morrell from decreasing the work force for the purpose of avoiding any of the provisions of the 1979 Master Agreement. Section 100 placed restrictions on Morrell following the closing of a plant. Under Section 100, Morrell was prohibited from contracting with other plants located within one hundred miles of a closed plant to provide services formerly provided by a closed plant. This restriction would remain in effect during a five-year period following a plant closing. Section 101 provided the conditions under which a new company plant would be brought under the provisions of Master Agreement in effect at the time of the plant opening. Section 101 only applied to plants opened in the "greater Midwest" and the "far West" regions of the country.
 
 
 7
 In May 1981, Morrell began issuing notices of closing to certain of its meat packing plants covered by the 1979 Master Agreement. Morrell represented these closings to be permanent. In December 1981, the Rodeo Plant became the fifth Morrell plant to receive a closing notice, with the effective date of closure scheduled for June 1982. By Spring 1982, Morrell had either closed or issued closing notices to seven of its ten plants.
 
 
 8
 In May 1982, as expiration of the initial term of the 1979 Master Agreement approached, the Union and Morrell met to begin new Master Agreement negotiations. In an effort to avoid the closure of several plants, the Union offered Morrell a concessionary package. Under the package, the Union offered, among other concessions, a three year wage freeze and suspension of all cost-of-living payments for the life of a new agreement. Morrell, however, rejected the Union's offer, and instead proposed changes in the Master Agreement whereby individual plants would be subject to separate wage and benefits packages. For the Rodeo Plant, Morrell proposed a forty percent cut in wages as well as cuts in benefits. The Rodeo Plant employees followed the Union's strong recommendations against the offer and voted to reject it.
 
 
 9
 As the time for the Rodeo Plant closing drew near, the Union, suspecting that Morrell might attempt direct negotiations with the Rodeo Plant Local, ordered the Local executive officer not to discuss any provisions of the Master Agreement with Morrell. Instead, the Union met again with Morrell officials in June 1982. However, nothing was achieved at that meeting and the Rodeo Plant was closed as scheduled on June 19, 1982. Pursuant to the 1979 Master Agreement, Plaintiffs received severance benefits upon closure of the plant.
 
 
 10
 In July 1982, negotiations between Morrell and the Union resumed. In August, Morrell offered what it termed a "final offer of settlement" which included the elimination of Sections 100 and 101 of the Master Agreement. The Union rejected the offer and Union representatives voted to authorize a strike at Morrell's Sioux Falls plant. Intervening negotiations failed, and, on September 1, 1982, the Sioux Falls workers went out on strike. Two days later, the Union distributed a handbill to the Sioux Falls workers that stated, "[o]n August 31st it became clear to us that Morrell wants [Sections] 100 and 101 eliminated because they intend to start operations at some or all of the closed plants." Appellant App. at 283.
 
 
 11
 Negotiations reconvened on September 7, 1982. On September 10, 1982, the parties signed a new Master Agreement, ending the Sioux Falls strike. In reaching agreement with Morrell, the Union entered into two secret side letter agreements. These side letter agreements, entered into on September 9, 1982 and September 10, 1982, affected the interpretation of Section 101 in the new Master Agreement. The September 9, 1982 letter provided that the plant located in Arkansas City, Kansas (the Rodeo Plant) "shall be included in the Southeast." Appellant App. at 295. The September 10, 1982 side letter specifically provided that "nothing in the Master Agreement executed today precludes [Morrell] from reopening previously closed plants located at ... Arkansas City, Kansas ... and that if such plants are reopened, no provision of said Master Agreement requires that such plants be subject to said Master Agreement." Appellant App. at 296. As a result of these two side letters, Morrell was allowed to reopen the Rodeo Plant as a nonunion plant without having to pay Master Agreement wages.
 
 
 12
 The Union failed to notify Plaintiffs of the existence or the content of the two side letter agreements. After hearing about the contents of the new Master Agreement from a Sioux Falls worker, the Rodeo Plant steward, a class member, contacted Union official John Mancuso. The steward asked Mancuso whether the Union agreed to let Morrell open the Rodeo Plant back up again. Mancuso's notes from the conversation state, "[t]his guy (the Rodeo Plant steward) kept asking if we (the Union) agreed with the company to let them reopen and I kept telling him we didn't." Appellant App. at 317.
 
 
 13
 In March 1983, Morrell reopened the Rodeo Plant facility as the Ark City Packing Company ("ACPC"). The Union notified Plaintiffs that "if it is established that [Morrell] violated the [Master Agreement], ... we will pursue through the National Labor Relations Board [ ("NLRB") ], any and all damages as a result of such violations." Appellant App. at 334. On March 29, 1983, the Union filed an unfair labor practice charge with the NLRB. The Union charged Morrell with failing to recognize the Union, failing to recall Union employees, and unilaterally changing the terms and conditions of employment upon reopening of the plant. However, in exchange for Morrell's agreeing to let the Union represent the workers of the reopened ACPC plant (formerly Rodeo Plant), the Union withdrew the unfair labor practice charge. The NLRB approved withdrawal of the charge in September 1983, and Plaintiffs instituted the present action in the same month.
 
 
 14
 After an eight-week trial on the issue of liability, the jury found that Morrell breached Section 10 and Section 100 of the 1979 Master Agreement.[2] The jury also found that the Union acted arbitrarily, discriminatively, or in bad faith by failing to protect Plaintiffs' rights with respect to Morrell's breaches. Furthermore, the jury concluded that Plaintiffs' claims against the Union were timely filed, and, with regard to Morrell's breach of Section 10 of the 1979 Master Agreement, the jury concluded that Plaintiffs were excused from exhausting their remedies. The Union filed a motion for judgement [sic] notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial. The district court denied the motions.
 
 
 15
 The issue of damages was determined by the court. Following extensive briefing by the parties, the court determined that damages were to be assessed based on apportionment rather than joint and several liability. 720 F.Supp. 862. The court then apportioned damages based on proportionate fault. The court concluded that the Union was liable for twenty-five percent of Plaintiffs damages, and entered judgment against the Union in the amount of $4,730,869.
 
 
 16
 [T]he Plaintiffs claim[ed that] the district court erred in its calculation of damages. The Union cross appeal[ed], claiming the district court erred in denying its post-trial motions, and raise[d] evidentiary issues relating to the court's damage award.
 
 
 17
 Id. at 1467-69.
 
 
 18
 We affirmed the district court's denial of the Union's motion for JNOV, or in the alternative, for a new trial, but reversed and granted a new trial on damages. Id. at 1479.
 
 
 19
 Specifically, we held that the district court abused its discretion in refusing to allow the Union to present evidence that Morrell would have decreased the Rodeo Plant work force even in the absence of the breaches by Morrell and the Union. We instructed the district court, upon remand, to allow the Union the opportunity to present evidence that Morrell would have, absent any breaches, decreased its Rodeo Plant work force to no more than 300 employees. Id. at 1473-74. We also held that in this hybrid Sec. 301 case, damages must be awarded to Plaintiffs from the date of the Rodeo Plant closing until February 17, 1987--the date that the settlement between Plaintiffs and Morrell was approved by the court. We instructed the district court, upon remand, to calculate the Plaintiffs' damages from June 19, 1982 until February 18, 1987. Id. at 1479. This extended time period greatly benefited Plaintiffs.
 
 
 20
 Pursuant to our remand order, as we have already observed, the district court conducted a rehearing on the back pay and related damages and fixed damages due the Plaintiffs from the Union at $13,739,612. On appeal, the Union claims that the district court again erred in its calculation of damages.
 
 III. Discussion
 
 21
 The Union contends that the district court erred in determining the number of jobs that would have been available to the class members absent the breaches established in this case. Specifically, the Union argues that the district court erred regarding the law governing reduction in work force inquiries, and that the district court's reduction in force scenario is inconsistent with the record.
 
 
 22
 In reviewing the district court's determination of the amount of damages, we apply the clearly erroneous standard. Aguinaga I, 993 F.2d at 1477. We are not so constrained, however, when the district court's damage calculation is based on a misconception of the controlling rule of law. Id. (citing Chaparral Resources, Inc. v. Monsanto Co., 849 F.2d 1286, 1289 (10th Cir.1988)).
 
 
 23
 In determining the number of jobs that would have been available to the class members absent the breaches, the district court stated that:
 
 
 24
 [t]he primary purpose of the damages rehearing was to allow the Union to present evidence that not all members of the plaintiff class would have retained their jobs even in the absence of breaches by Morrell and the Union. As pointed out by Tenth Circuit in this matter, the burden is on the defendant to prove by a preponderance of the evidence that an employee would have been discharged or laid off at a later date, or that the employee's job would have been phased out, even if no breach of contract and no breach of the duty of fair representation had occurred. Aguinaga I, 993 F.2d at 1473.
 
 
 25
 The court must derive a figure approximating the total level of employment that would have obtained absent the breaches.
 
 
 26
 Aguinaga v. United Food & Commercial Workers International Union, 854 F.Supp. 757, 763 (D.Kan.1994).
 
 
 27
 The district court went on to determine that:
 
 
 28
 Absent the breaches by Morrell, the Rodeo plant would not have closed. The start-up process and corresponding gradual increase in employment [at ACPC] would have been avoided. Instead Morrell would have begun the process of laying off its least senior employees to take into account the shifts in production that it intended to implement at the plant.
 
 
 29
 Id. at 765-66.
 
 
 30
 After carefully considering the evidence, the district court concluded:
 
 
 31
 From the beginning of the damage period until the end of August 1983, employment at Rodeo would have remained at the preclosing level of approximately 720 employees. Thus, all 641 plaintiffs are entitled to damages through this period. From the beginning of September of 1983 until the beginning of October 1985 (a total of 25 months), Morrell would have gradually reduced employment by 220, from 720 to 500. As an approximation of what would have occurred absent the breaches, the court finds that Morrell would have laid off the nine least senior employees per month (effective on the last day of the month) until a total employment level of 500 was reached by October 1, 1985.
 
 
 32
 Id. at 766 (footnote omitted).
 
 
 33
 The Union contends that the district court erred by rejecting the Unions position that the Rodeo Plant would have been closed, even if Morrell did not breach its contract. Basically, the Union is asserting on appeal a similar argument it forwarded in the district court, i.e., that it is necessary for this court to rely upon Morrell's post-breach actions as indicative of what Morrell would have done absent the breaches. This argument lacks merit.
 
 
 34
 The record reveals that the district court properly examined all the evidence to determine what Morrell would have done in the absence of the breaches. The district court concluded that the evidence presented by the Union was hypothetical and speculative and found no evidence to support the Union's position that Morrell would have taken the same actions if it had acted lawfully as it did when it acted unlawfully.
 
 
 35
 The Union also argues that the undisputed facts overwhelmingly demonstrate that the actual employment levels at the Ark City Packing Company ("ACPC") plant establish the maximum employment levels that would have been reached absent the breaches. In other words, the employment levels that actually existed in the ACPC facility would have occurred in spite of the breaches. The district court determined that Morrell would have decreased the work force, but not to the extent advocated by the Union.
 
 
 36
 Based on the evidence, the district court reasonably concluded that had Morrell not breached its contract, all class members would have been retained for some period of time, and then the number of workers gradually adjusted until the approximate levels at the operation at ACPC were reached. A review of the record supports this determination by the district court regarding the number of jobs that would have been available to the class members absent the breaches, and therefore, is not clearly erroneous.
 
 
 37
 The Union also argues that the district court erred in selecting a wage rate for back pay computations after September 1, 1983. The Union contends that the ACPC wage rates should govern the pertinent back pay calculations because, pursuant to federal labor law, the wage rates applicable for the damage period following September 1, 1983 are the rates applicable under the negotiated Union contracts at ACPC, the facility at which the eligible class members were entitled to employment. We disagree.
 
 
 38
 In determining the relevant wage rate from September 1, 1983 through the end of the damage period, the district court stated that:
 
 
 39
 The court shall not apply the ACPC wage rate. Prior to the closing, Rodeo's production workforce was 100% union. Absent the breaches, the Rodeo plant would never have been nonunion. Morrell would not have been able to set unilaterally an initial wage rate of $5.00 per hour. There would have been no need for the Union to organize the workforce at ACPC. A contract separate and distinct from the Master Agreement would not have been negotiated.
 
 
 40
 The ACPC contract with the Union provided an initial wage of $7.00 per hour. This wage rate flowed directly from the breaches of contract and breaches of the duty of fair representation. Absent the wrongful conduct which actually occurred, it is more likely that the Rodeo plant would have been governed by the new Master Agreement in effect at the remaining Morrell plants. Absent the breaches, the Arkansas City plant would have remained a part of the Morrell "chain" and would have been governed by subsequent Master Agreements. Absent the breaches, the Master Agreement wage rates would have continued in effect. The new Master Agreement wage rates applicable at Sioux Falls shall apply to the remainder of the damage period.
 
 
 41
 Id. at 762.
 
 
 42
 In Aguinaga I, we declared that "[i]n hybrid Sec. 301 cases, '[o]f paramount importance is the right of the employee, who has been injured by both the employer's and the union's breach, to be made whole.' " Aguinaga I, 993 F.2d at 1477-78 (quoting Bowen v. United States Postal Serv., 459 U.S. 212, 222, 103 S.Ct. 588, 594-95, 74 L.Ed.2d 402 (1983)). "Applying this general rule of awarding back pay and benefits until rejection of an offer of reinstatement is the only way Plaintiffs can be made whole--i.e., put in the same position as if Morrell had not breached the 1979 Master Agreement and the Union had not breached its duty of fair representation." Aguinaga I, 993 F.2d at 1479 (footnote omitted). Following these principles, the district court did not err in determining the relevant wage rate from September 1, 1983 through the end of the damage period because the district court reasonably found that the Arkansas City plant would have remained a part of the Morrell "chain" and would have been governed by subsequent Master Agreements. This finding properly places the workers in the position that they would have occupied absent the breaches.
 
 
 43
 The Union finally contends that the district court erred in altering the damages computation rule established in Aguinaga I. The Union argues that when the district court adopted the Plaintiffs' proposed gross losses versus gross setoffs rule for calculating damages in Aguinaga I, the district court established a rule of law to control the damage calculations. Because neither party challenged that computation rule on appeal and the Tenth Circuit's mandate did not provide for any predetermination of the setoff rule, the Union asserts that the Aguinaga I computation rule governs.
 
 
 44
 On remand, the district court calculated the Plaintiffs' damages from June 12, 1982 until February 18, 1987. In determining the damages for this extended period of time, the district court addressed the issue of how to properly subtract setoffs from gross damages. When addressing the issue of how to account for setoffs that accrued during the damage period with respect to pension benefits and wages (also referred to as benefit netting), the district court stated:
 
 
 45
 it is unsound, both under the law and under accepted accounting and actuarial principles, to setoff earnings against pensions and vice versa. These two components of the damage award are computed in greatly different manners. Interim earnings are a straightforward matter derived from the plaintiffs' tax returns. Pension losses require the efforts of an accountant and an actuary and involve the use of mortality statistics and an appropriate discount rate. It is indeed the comparison of apples and oranges to lump together both categories of damages.
 
 
 46
 Setoffs from one category shall not be carried over into another category of damages.
 
 
 47
 Id. at 768.
 
 
 48
 We disagree with the district court's analysis that setoffs from one category of earnings should not be carried over into another category of damages and that interim earnings should not be carried over to reduce pension damages. As we have previously stated in Aguinaga I, the purpose of a back pay award is to make the employee whole and restore the economic status quo that would have been obtained but for the wrongdoing on the part of the employer and the union. Aguinaga I, 993 F.2d at 1473. The district court's benefit netting calculation, which does not examine wages and pension benefits as a whole, contravenes the purpose of an award of back pay by giving an unfair advantage to the Plaintiffs and depriving the Union of benefit of mitigation resulting from total compensation package setoffs. Therefore, the district court erred by disallowing the carry over of setoffs from one category of damages, such as pension benefits, to another category of damages, such as earnings.
 
 
 49
 At oral argument, counsel for the Plaintiffs asserted that if we reversed the district court's method of calculating benefit netting, the judgment against the Union would be reduced by approximately $800,000. We deem this a conservative estimate.
 
 
 50
 We believe, however, that it is appropriate for us to attempt to close this extensive litigation which has spanned two decades. We, therefore, grant a remittitur of $1,000,000 on the damage award, less prejudgment interest on that amount (to be calculated by the agreement of the parties) subject to acceptance by Plaintiffs. Should Plaintiffs reject this remittitur the cause shall be remanded to the district court for the limited purpose of calculating the offsetting amount by allowing all benefits (including all wages and all benefits) to the setoff against all damages.
 
 IV. Conclusion
 
 51
 Subject to Plaintiffs' acceptance of the remittitur set forth herein, and the entry of an appropriate reduced judgment of $1,000,000, less prejudgment interest previously awarded on this amount of damages, we affirm the judgment as modified. Otherwise, on rejection of the remittitur, this cause shall be remanded for a partial new trial on damages in conformity with this opinion.
 
 
 52
 We grant Plaintiffs fifteen days to notify the clerk of this court that the remittitur is declined. Otherwise, the reduced award shall be deemed accepted and on remand the district court shall enter an appropriate reduced judgment. Plaintiffs are entitled to 90% of their costs.
 
 
 
 *
 The Honorable Myron H. Bright, Senior Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 [1]
 The Union also appealed the district court's initial award of attorneys fees, and we reversed the district court's determination. See Aguinaga v. United Food and Commercial Workers Int'l Union, 993 F.2d 1480 (10th Cir.1993) ("Aguinaga II ")
 
 
 [2]
 A hybrid action under Sec. 301 of the LMRA involves two claims: (1) that the employer breached the collective bargaining agreement, and (2) that the union breached its duty of fair representation. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 163-65, 103 S.Ct. 2281, 2289-91, 76 L.Ed.2d 476 (1983). The plaintiff must prove both breaches in order to prevail. Id. Therefore, although Morrell had already settled with Plaintiffs prior to trial, Plaintiffs were still required to prove that Morrell breached the 1979 Master Agreement in order to prevail against the Union