**Kim DOUGLASS, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. CIV.A. 03–2325CM.**

United States District Court,
D. Kansas.

March 31, 2005.

---

Kim F. Douglass, Kansas City, MO, Pro se.

Michael A. Williams, Lathrop & Gage, LC, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

On June 18, 2003, Kim Douglass, a pro se plaintiff, brought suit against defendant General Motors Corporation ("GM") claiming race and gender discrimination, hostile work environment and retaliation in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act of 1990 ("ADA"), Occupational Safety and Health Administration ("OSHA") violations, intentional infliction of emotional distress, invasion of privacy, and violation of company policy and collective bargaining agreements. Plaintiff also brought suit against United Auto Workers ("UAW") Local 31, case number 03–2394. The two cases were consolidated for discovery purposes only. Both GM and UAW have filed summary judgment motions. Although many of the claims against GM and UAW are the same or substantially similar, the court will address the defendants' motions separately. Pend-

ing before the court is GM's Motion for Summary Judgment (Doc. 58).

## I. Facts [1]

■ As a preliminary matter, plaintiff failed to specifically controvert any facts submitted by GM. Therefore, pursuant to D. Kan. Rule 56.1(a), all facts submitted by GM are deemed admitted by plaintiff.

Plaintiff is an African–American female who was born on November 6, 1956. Plaintiff was hired by GM as an hourly employee on July 14, 1977, and worked at the GM Leeds Plant, located in Kansas City, Missouri, until it closed in 1987. Plaintiff transferred to the Fort Wayne, Indiana GM plant in September 1991. In September 1994, plaintiff transferred back to GM's Kansas City, Kansas Fairfax plant.

Plaintiff became a member of UAW Local 31 and UAW in September 1994. GM and UAW are parties to a national collective bargaining agreement, and UAW Local 31 and GM are parties to a local collective bargaining agreement. Both collective bargaining agreements govern the hours, wages, working conditions and other terms and conditions of employment of bargaining unit employees employed at the Fairfax plant, including plaintiff.

Pursuant to GM's worker's compensation policy and the terms of the collective bargaining agreement, employees with work-related injuries are sent to the plant medical department for medical release and verification of their restrictions. The restrictions are then placed on a Notice of Restriction form and forwarded to an Accommodating Dis–Abled People in Transition ("ADAPT") program placement representative. The ADAPT program, a joint program between the union and management, attempts to place GM employees with medical restrictions in jobs that are consistent with the individual's medical restrictions and plant seniority. If ADAPT is unable to place an employee in a position that meets her restrictions, the employee is placed on a paid medical leave of absence.

In October 1994, plaintiff stopped working at the Fairfax plant because of shoulder injuries. Between October 1994 and July 1995, plaintiff was on medical leave and worked only one day because the Fairfax plant did not have available positions within her restrictions.

Plaintiff had knee surgery for a non-work related knee injury in July 1995, and did not return to work until February 2001. During her absence from GM between July 1995 and February 2001, plaintiff received benefits from GM pursuant to the terms of the collective bargaining agreement.

The collective bargaining agreement between GM and UAW provides that employees who have been absent from the plant for more than thirty days can be asked to take a functional capacity examination. The functional capacity examination determines the employee's abilities to perform the physical tasks required to work in various assembly plant jobs. On January 11, 2001, plaintiff took a functional capacity examination. On or about Febru-

---

1. The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56. However, in most instances, plaintiff failed to cite to the record. In other instances, the record simply did not support plaintiff's factual contentions. The court will therefore exclude from this opinion those factual contentions which contain no support in the record. The court also excludes those factual contentions which are based on inadmissible hearsay. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir.2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment.").

ary 6, 2001, GM notified plaintiff that there was a position available within her restrictions and requested plaintiff return to work on February 12, 2001. Plaintiff worked at the Fairfax plant from February 12, 2001, when she was placed on the "battery cable install" job, until March 6, 2001, when she allegedly suffered a right shoulder injury.

Plaintiff returned to work in April 2001, at which time she was placed on the "spare tire job." Plaintiff was placed on the "transmission job" and "starter job" in April or May 2001. Plaintiff believes the spare tire job, the transmission job, the starter job and the battery cable install job were not within her medical restrictions. Plaintiff never filed any grievances over being placed in jobs that she could not perform.

Plaintiff stopped working in May 2001 due to a worker's compensation injury. Plaintiff returned to work in July 2001 and worked in an assembly position until the end of September 2001, when she had surgery on her shoulder. Plaintiff was on paid worker's compensation leave from September 2001 through April 2002.

In January 2002, plaintiff returned to the plant with medical restrictions from Dr. Lowry Jones limiting her to no overhead work. The plant medical director, a white male, and the ADAPT Representative, an African–American female, were unable to place plaintiff in an available position within her restrictions in January 2002, and she was certified for paid leave until February 2002. On or about February 20, 2002, plaintiff returned to the plant with medical restrictions from Dr. Jones stating: "I would like to send her back to therapy for functional capacity evaluation, defining her work restrictions. At this time she is on a 30–pound lifting restriction to the chest, 5 pounds overhead." Plaintiff did not file a grievance over her

attempts to return to work in January and February 2002.

In February 2002, plaintiff participated in a two-day functional capacity evaluation ordered by Dr. Jones. On or about March 4, 2002, GM received the results of plaintiff's functional capacity evaluation, which recommended "return to full duty work with no restrictions related to the upper extremities." On April 2, 2002, the plant medical director and ADAPT representative placed plaintiff on the "sticker job," an available position within her new restrictions. The "sticker job" required plaintiff to place stickers in the hood, bumper and trunk of cars. Plaintiff was physically capable of performing this job but alleged it caused her pain. No doctor or medical professional told plaintiff that this job was outside of her medical restrictions. On April 22, 2002, plaintiff requested and received a pass to leave the plant from her supervisor. Plaintiff has not returned to work at GM since that time.

After leaving the Fairfax plant on April 22, 2002, plaintiff requested and received sick leave papers. Dr. Howard Houghton, plaintiff's psychiatrist, informed GM that plaintiff was suffering from depression and would need to be off of work until July 3, 2002. On June 11, 2002, plaintiff went to another psychiatrist, Dr. Fred Fayne, who submitted documentation to GM stating that plaintiff had "major depression, recurrent stress" and "prolonged grief reaction" and could not return to work until August 1, 2002. Dr. Fayne also opined that plaintiff's condition was not caused by the work at GM. On August 1, 2002, Dr. Fayne notified GM that plaintiff was not released to return to work for an additional ninety days. On October 25, 2002, Dr. Fayne extended the restriction, telling GM that plaintiff could not return to work for another ninety days. GM referred plaintiff to Dr. Fernando Egea, another psychia-

trist, for a second opinion. Dr. Egea concurred with Dr. Fayne that plaintiff was not mentally capable of returning to work at that time. Dr. Fayne and Dr. Egea continued to recommend that plaintiff remain off work until July 3, 2003, when Dr. Fayne informed GM that plaintiff was "100% totally disabled from work" and would never be capable of returning to GM.

Pursuant to the collective bargaining agreement between GM and UAW, when an employee transfers from one plant to another and has GM corporate seniority greater than January 7, 1985, the employee will be given a plant seniority at the new plant of January 7, 1985. This provision of the agreement, which became effective in 1984, was collectively bargained for and applies to all transferring employees regardless of age, race, sex or disability. UAW Local 31's collective bargaining agreement allows employees with higher plant seniority dates to "bump" employees with lower plant seniority dates off their jobs, even if the less senior employee has ADAPT restrictions. Employees with less plant seniority cannot bump another employee from a job.

If a UAW member employed by GM feels she has been discriminated against due to race, age, sex, disability or other protected status, the member may file a grievance under paragraph 6(a) of the national collective bargaining agreement. Each grievance written under paragraph 6(a) is assigned to the local union's Civil Rights Committee for investigation, and the committee is requested to prepare a report which is submitted to the local shop chairman. Plaintiff never filed a charge of discrimination with UAW Local 31's Civil Rights Committee.

The record reflects that plaintiff does not allege any manager or supervisor at GM discriminated against her. No one in the ADAPT program said anything racially derogatory to plaintiff. No official of UAW Local 31 ever made any comments to plaintiff which she felt to be inappropriate because of any reference to race, sex, age or disability.

Plaintiff is aware of GM's written anti-discrimination policy. Plaintiff is also aware that GM has an "Awareline," which is a toll-free number that GM employees may use to lodge complaints.

On or about November 1, 2002, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Kansas Human Rights Commission ("KHRC"). The charge alleged that GM discriminated against her on the basis of race, sex, age, disability and retaliation, stating:

> [GM] failed to accommodate me based on my race, black, gender, female, age, 45, my disabilities, and a continual pattern of retaliatory, harassing, and intimidating acts to inflict emotional and financial hardships in violation of the [sic] Title VII of the Civil Rights Act of 1964, as amended, and the Americans with Disabilities Act of 1990.

On or about March 21, 2003, the EEOC issued a "no probable cause" determination and Notice of Right to Sue. Plaintiff has not had any contact with GM management since April 22, 2002. Plaintiff applied for, and was awarded, a full medical retirement from GM in February 2004.

On or about March 15, 2001, OSHA notified GM that plaintiff had filed a complaint alleging she was required to work outside her restrictions. GM responded to OSHA's information request and OSHA notified plaintiff that her allegations had been resolved to its satisfaction. OSHA notified plaintiff that any alleged retaliation relating to her complaint should be filed as soon as possible with OSHA because they "normally accept only claims

filed within 30 days of the alleged discriminatory action."

Plaintiff also alleges that an unknown person at MetLife in Michigan, GM's third-party benefits administrator, changed her plant "code," causing her first retirement check to be delayed. Plaintiff does not know who changed the code or when the change occurred. The code was corrected when plaintiff contacted a MetLife representative.

Plaintiff further alleges a burgundy car followed her while she was driving in the summer of 2001 while her worker's compensation claim was pending. Plaintiff drove to a police station and the police questioned the individual in the car. The police informed plaintiff that the individual had a legitimate reason for his actions.

Plaintiff lives alone in a split-level home and is capable of cooking, cleaning and taking care of herself on a daily basis. Plaintiff drives and maintains her own car. Plaintiff has no problem with her shoulder while she is not working, and she takes care of her own grooming. Plaintiff is not currently under any physical medical restriction. Plaintiff continues to take medication for depression and is capable of functioning and taking care of her daily affairs.

## II. Legal Standards

### A. Pro Se Litigants

■■■ The court is mindful that plaintiff in this action appears pro se. A pro se litigant's pleadings are to be construed liberally and are held to a less stringent standard than formal pleadings drafted by lawyers. *See Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991). However, this does not excuse plaintiff from the burden of coming forward with evidence to support her claims as required by the Federal Rules of Civil Procedure and the local rules of this court. *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio,* 847 F.2d 642,

649 (10th Cir.1988). Even a pro se plaintiff must present some "specific factual support" for her allegations. *Id.*

■■■ Moreover, the Tenth Circuit has stated:

> We believe that this rule means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.

*Hall,* 935 F.2d at 1110. The court may not, however, assume the role of advocate for the pro se litigant. *See Van Deelen v. City of Eudora, Kan.,* 53 F.Supp.2d 1223, 1227 (D.Kan.1999). Furthermore, the court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. State of N.M.,* 113 F.3d 1170, 1173–74 (10th Cir. 1997) (citing *Hall,* 935 F.2d at 1110).

### B. Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if

"there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

### A. Procedural Issues

#### 1. Statutory Preclusion

■ Plaintiff's primary complaint of discrimination under Title VII, the ADA and the ADEA is that GM discriminated against her when it assigned her a plant seniority date of January 7, 1985, subsequent to plaintiff's transfer from the Leeds GM plant in Kansas City, Missouri to the Fort Wayne, Indiana GM plant. Pursuant to the collective bargaining agreement between GM and UAW, when any employee transfers from one plant to another with a GM corporate seniority greater than January 7, 1985, the employee will be given a January 7, 1985 plant seniority at the new plant. As a result of her January 7, 1985 plant seniority date, plaintiff alleges that African–American females over the age of forty were discriminated against because employees with more seniority could "bump" them from certain jobs, thereby limiting the employees' ability to be placed on jobs within their disability restrictions and within their seniority.

GM urges the court to grant its motion for summary judgment on the grounds that plaintiff's discrimination claims are precluded by 29 U.S.C. § 623(f) and 42 U.S.C. § 2000e–2(h),[2] which generally state that it is not unlawful for an employer to apply different standards of compensation or terms of employment provided that such compensation or terms are made pursuant to a bona fide seniority system and such differences are not the result of the employer's intention to discriminate on the basis of race, color, religion, sex, or national origin. Plaintiff failed to respond to this argument.

---

**2.** The Tenth Circuit in *Hiatt v. Union Pacific Railroad Company* held that the language of 29 U.S.C. § 623(f) and 42 U.S.C. § 2000e– 2(h) are "essentially identical." 65 F.3d 838 (10th Cir.1995).

■ The Tenth Circuit has held that "challenges to the routine operation of a bona fide seniority system must rest upon a claim of disparate treatment." *Hiatt,* 65 F.3d at 842. Therefore, to overcome GM's motion for summary judgment, plaintiff must set forth specific facts demonstrating that GM's seniority system resulted in disparate treatment, rather than a disparate impact, on the basis of race, gender, age, or disability.

The record indicates that plaintiff was assigned her seniority date pursuant to a bona fide seniority system. Plaintiff has failed to argue, much less present supporting evidence, that the seniority provisions of GM's collective bargaining agreement with UAW intentionally discriminated against plaintiff on the basis of race, gender or age. Moreover, plaintiff's opposition to GM's summary judgment motion contends that GM's alleged discrimination regarding seniority created a disparate impact, rather than was the result of disparate treatment: "And [GM] failed to accommodate black female workers who have seniority and were forced to go on disability leave or retire thus creating a *disparate impact* on the older female worker." (Pl.'s Resp. at 13) (emphasis added). Therefore, because plaintiff has failed to show that GM's seniority system resulted in disparate treatment of African–American females over the age of forty, plaintiff's discrimination claims are precluded by 29 U.S.C. § 623(f) and 42 U.S.C. § 2000e–2(h).

## 2. Exhaustion of Administrative Remedies

■ GM next argues that plaintiff failed to exhaust her Title VII and ADA administrative remedies by failing to file a timely charge of discrimination with the EEOC or an appropriate state agency within 180 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e–5(e)(1) (governing Title VII); 42. U.S.C. § 12117(a) (applying 42 U.S.C. § 2000e–5(e)(1) to the ADA). The 180 day period is extended to 300 days if a charge is filed with a state or local agency with the authority to grant or seek relief. *Id.* This filing requirement acts as a statute of limitations period. Therefore, subsequent action in federal court is generally barred if the filing requirement is not met. *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1310 (10th Cir.1999).

Plaintiff filed a charge of discrimination with the EEOC and the KHRC on November 1, 2002. Because plaintiff filed a charge with the KHRC, a 300 day limitation applies. GM contends that plaintiff cannot bring a claim under Title VII, the ADEA or the ADA for any alleged acts occurring prior to January 6, 2002, or 300 days before plaintiff filed her charge of discrimination.

■ According to her amended complaint, GM's alleged acts of discrimination occurred when plaintiff was assigned a plant seniority date of January 7, 1985, subsequent to transferring from the GM Leeds plant in Kansas City, Missouri to the Fort Wayne, Indiana GM plant. Based on plaintiff's response, the record reflects that plaintiff was assigned her January 7, 1985 seniority date some time in 1991,[3] well beyond the 300 day limitations period.

---

**3.** Plaintiff's opposition: "When [plaintiff] transferred to the Fort Wayne Truck & Bus in 1991 she was subjected to provisions that did not affect her at Leeds, and she knew nothing of those provision [sic] until her transfer.. [sic] The January 7, 1985 seniority date that she was given, [sic] was not a factor in job placement with regards to her disability because that plant has no Local Agreement that allows for any employee to bump another employee except for shift preference." (Pl.'s Resp. at 11).

Plaintiff alleges that GM discriminated against her when it applied her new January 7, 1985 plant seniority date to its "bumping" policy, which allows employees with more seniority to bump less senior employees off their jobs. Significantly, however, plaintiff does not contend that she was ever bumped directly as a result of GM's attempt to intentionally discriminate against her.[4] Plaintiff also argues that she was unaware of the effects that GM's seniority date assignment system would have on her because she was unaware of UAW Local 31's Local Bargaining Agreement that allowed bumping of employees with less seniority. However, even if plaintiff could show that she was not aware of the allegedly discriminatory effect of GM's seniority system until as late as 2001 or 2002, plaintiff's arguments still fail because she has not shown that she was bumped from any job during the 300 days prior to filing her EEOC and KHRC charge.

Specifically, the facts show that plaintiff did not work at GM from September 2001 until April 2, 2002. Plaintiff's only contact with GM managers or supervisors during this period occurred in January and February 2002, after which plaintiff was not returned to work but was instead sent home on paid leave. Plaintiff returned to work on April 2, 2002, but has been excused from work since April 22, 2002, by her psychiatrist. Plaintiff did not return to work at GM after April 22, 2002. There is no evidence, nor has plaintiff alleged, that she was bumped at any time from September 2001 to the present, let alone from January 6, 2002 to the present. Accordingly, plaintiff has failed to timely exhaust her administrative remedies with

respect to her discrimination claims. Because the plaintiff's discrimination claims are precluded by 29 U.S.C. § 623(f) and 42 U.S.C. § 2000e–2(h) and plaintiff has failed to timely exhaust her administrative remedies on the discrimination claims, the court hereby grants GM's summary judgment motion with respect to plaintiff's ADA, ADEA and Title VII gender and race claims.

**B. Remaining Claims**

Following dismissal of the aforementioned claims, plaintiff's remaining claims are for hostile work environment, retaliation, OSHA violations, intentional infliction of emotional distress, invasion of privacy, and violation of company policy and collective bargaining agreements.

The court has granted summary judgment on plaintiff's Title VII claims with respect to her gender and race discrimination claims. However, the court did not include plaintiff's Title VII hostile work environment and retaliation claims in this dismissal. Plaintiff's EEOC and KHRC charge alleged "a continual pattern of retaliatory, harassing, and intimidating acts to inflict emotional and financial hardships in violation of the [sic] Title VII of the Civil Rights Act of 1964." Plaintiff alleged an ongoing pattern of hostile work environment and retaliation and although she has not been employed with GM since April 22, 2002, plaintiff did, in fact, work at GM during the period of time in which plaintiff was required to exhaust her administrative remedies. Therefore, viewing the facts in the light most favorable to the plaintiff, the court will assume that plaintiff exhausted her administrative remedies

---

4. For instance, plaintiff stated in her opposition that "The National agreement of changing ones [sic] corporate seniority to a lesser date, [sic] discriminates against older workers, because they are treated like new hires with regards to getting lighter work with the more seniority that they acquire." (Pl.'s Resp. at 12). Plaintiff did not, however, allege that GM ever specifically bumped her in an effort to discriminate against her.

with regard to her hostile work environment and retaliation claim, and will thus continue in its analysis of these claims.

### 1. · Racially Hostile Work Environment

 In support of her racially hostile work environment claim, plaintiff alleges that "[t]here have been several noose incidents at the plant," and while plaintiff admits to not personally viewing them, she argues that she was "still affected by these incidents." (Pl.'s Resp. at 16). In addition, plaintiff allegedly heard about a "racial incident in Michigan" in which "a supervisor walked into the plant with a KKK outfit on and made statements." *Id.*

GM's response to these allegations is that plaintiff only worked twenty days during the relevant time period, although GM fails to explain exactly what dates are included in the relevant time period. GM also argues that plaintiff has admitted that no manager or supervisor made any inappropriate comments to her.

 "To survive summary judgment on a racially hostile work environment claim, a plaintiff must show 'that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.'" *Chavez v. N.M.*, 397 F.3d 826, 831–32 (10th Cir.2005) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994)) (citations omitted). Furthermore, this burden cannot be met "by demonstrating 'a few isolated incidents of racial enmity' or 'sporadic racial slurs'"; plaintiff must instead demonstrate "'a steady barrage'" of offensive racial comments. *Id.*

Here, plaintiff's only support of her hostile work environment claim is two racially-motivated incidents which allegedly occurred at GM's plant, but did not occur in plaintiff's presence, and might not have even occurred while plaintiff was employed by GM.[5] In order to prevail on this claim, plaintiff must demonstrate harassment that is "pervasive or severe enough to alter the terms, conditions, or privilege of employment." *Chavez*, 397 F.3d at 832. However, plaintiff admits that no manager or supervisor made any inappropriate comment to her, and that she did not see a noose or any supervisor wearing a KKK outfit. In fact, this court has previously held that "[i]f the Court holds awareness of a noose, in and of itself, established a hostile environment, then each and every employee at GM who also heard about the nooses could theoretically assert a ·claim against GM." *Henderson v. Int'l Union*, 263 F.Supp.2d 1245, 1277 (D.Kan.2003). In accordance with the court's previous holding in *Henderson*, awareness of a noose incident, or the alleged KKK costume incident in Michigan, are simply not "pervasive or severe" enough to warrant survival from summary judgment. Therefore, the court grants GM's summary judgment motion on this claim.

### 2. Retaliation

 In furtherance of her retaliation claim, plaintiff alleges that an unknown person at MetLife, changed her plant "code" to the code for the Leeds facility for the purpose of delaying her disability retirement pay. GM denies that any mistake made in relation to plaintiff's disability retirement pay was intentional, and notes that plaintiff is unable to produce

---

5. GM argues that the alleged noose incidents occurred, by plaintiff's admission, in 2003, or after plaintiff ceased working for GM. However, GM did not provide record support for this admission, and therefore the court is unable to verify its accuracy.

any evidence showing that the error was intentionally made.

To make a prima facie case of retaliation, plaintiff must prove: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action." *Jeffries v. State of Kan.*, 147 F.3d 1220, 1231 (10th Cir.1998) (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir.1993)). Here, this standard requires plaintiff to prove that (1) MetLife was aware of plaintiff's efforts to curb GM's alleged discrimination; (2) that the change adversely affected plaintiff; and (3) that the change was done as a result of retaliatory animus.

Plaintiff did not specifically respond to GM's summary judgment arguments regarding her retaliation claim, except to additionally assert, without evidence or further explanation, that GM has unlawfully kept some of plaintiff's sick pay. Plaintiff admits, however, that the error was immediately corrected.

Plaintiff simply has not provided enough evidence to demonstrate that MetLife's error in plaintiff's retirement pay was a result of retaliatory animus; plaintiff has not provided any evidence about which particular MetLife employee might have made the error, or what his or her motivation would have been in doing so. In addition, plaintiff has not argued or demonstrated that MetLife was aware of plaintiff's charges of discrimination against GM. For these reasons, the court grants GM's summary judgment motion on this claim.

### 3. OSHA

Plaintiff also brought suit against GM under the Occupation Safety & Health Act ("OSHA"), 29 U.S.C. § 651 *et seq.* GM argues that OSHA does not permit a private cause of action.

OSHA does not create a private cause of action on behalf of injured workers. *See* 29 U.S.C. § 653(b)(4) ("Nothing in this Act shall be construed ... to enlarge or diminish or affect in any other manner the common-law or statutory rights, duties, or liabilities of employers and employees ...."); *see also Ellis v. Chase Communications, Inc.*, 63 F.3d 473, 478 (6th Cir.1995); *Mason v. Ashland Exploration, Inc.*, 965 F.2d 1421, 1425 (7th Cir.1992). Indeed, OSHA standards may not be introduced as evidence for any reason relating to civil liability. *McHargue v. Stokes Div. of Pennwalt Corp.*, 912 F.2d 394, 396 (10th Cir.1990). Thus, plaintiff is barred from bringing suit under OSHA. Accordingly, the court grants GM's motion for summary judgment on this claim.

### 4. Violation of Company Policy and Collective Bargaining Agreements

Plaintiff also brought two separate claims alleging GM violated its company policy and collective bargaining agreements by discriminating against her and other black female employees. GM argues this claim is barred by the six-month statute of limitations imposed under the § 301 "hybrid" method under *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).

Section 301 of the Labor Management Relations Act ("LMRA") makes collective bargaining agreements enforceable in federal court. *See* 29 U.S.C. § 185. However, the statute does not set forth a statute of limitations. In *DelCostello*, the United States Supreme Court determined that "federal labor policies and the practicalities of § 301 litigation supported the application of the six-month statute of limitations prescribed by § 10(b) of the LMRA, 29 U.S.C. § 160(b), to 'hybrid' § 301/unfair representation suits charging an employer breached a collective-bargaining agree-

ment and the union breached its duty of fair representation." *Edwards v. Int'l Union, United Plant Guard Workers,* 46 F.3d 1047, 1050 (10th Cir.1995) (citing *DelCostello,* 462 U.S. at 154–55, 103 S.Ct. 2281). On several occasions, the Tenth Circuit has followed *DelCostello* and applied a six-month statute of limitations to "hybrid" suits. *See Edwards,* 46 F.3d at 1052; *Aguinaga v. United Food & Commercial Workers Int'l Union,* 993 F.2d 1463, 1472 (10th Cir.1993); *Lucas v. Mountain States Tel. & Tel.,* 909 F.2d 419, 420 (10th Cir. 1990); *Rucker v. St. Louis Southwestern Ry. Co.,* 917 F.2d 1233, 1237–38 (10th Cir. 1990).

A "hybrid" suit, as defined in *DelCostello,* is so named because it "combines two conceptually independent causes of action, the first against the company for breach of the contract (a standard § 301 claim) and the second against the union for breach of the duty of fair representation (a claim implied by operation of a union's status under federal law as the sole bargaining representative of the employee)." *Webb v. ABF Freight Sys., Inc.,* 155 F.3d 1230, 1238 (10th Cir.1998). In addition,

> [t]o prevail against his former employer under this hybrid § 301/DFR [duty of fair representation] cause of action, a discharged worker must prove three elements: (1) Some conduct by the worker's union that breached the duty of fair representation; (2) A causal connection showing that the union's breach affected the integrity of the arbitration process, and; (3) A violation of the collective bargaining agreement by the company.

*Id.* at 1239. The fact that plaintiff brought suit against GM and UAW in separate suits is irrelevant, as a plaintiff "need not sue both his union and former employer in the same case, and he may choose to seek damages against only one of the potential defendants, but in any event, 'the case he must prove is the same whether he sues

one, the other, or both.'" *Id.* (quoting *DelCostello,* 462 U.S. at 165, 103 S.Ct. 2281).

Plaintiff argues that a four-year statute of limitations applies to these claims pursuant to *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), in which the Supreme Court applied a four-year statute of limitations for hostile work environment, wrongful termination and failure-to-transfer claims brought under 42 U.S.C. § 1981. However, plaintiff has not brought claims under 42 U.S.C. § 1981. Instead, plaintiff has alleged violation of company policy and collective bargaining agreements against GM, a standard claim under § 301 of the LMRA, as well as for unfair representation against UAW, that fit squarely within the "hybrid" exception set out in *DelCostello.* Therefore, a six-month statute of limitation applies. *DelCostello,* 462 U.S. at 169, 103 S.Ct. 2281.

The six-month statute of limitations begins running "when the employee 'knows or in the exercise of reasonable diligence should have known or discovered the acts constituting the union's alleged violations.'" *Edwards,* 46 F.3d at 1053 (quoting *Lucas,* 909 F.2d at 420–21). Here, plaintiff ceased working at GM on April 22, 2002, and filed the instant suit on June 18, 2003, or well over a year after any of plaintiff's allegations could have occurred. Therefore, these claims are barred by the statute of limitations, and GM's motion for summary judgment is granted on these claims.

## 5. State Law Claims

Plaintiff additionally asserts state law claims of intentional infliction of emotional distress and invasion of privacy. This court has already dismissed all of plaintiff's federal claims. When plaintiff filed suit, this court had supplemental jurisdic-

tion of plaintiff's state law claims pursuant to 28 U.S.C. § 1367. However, the district court "may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Jinks v. Richland County, S.C.*, 538 U.S. 456, 458, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). Here, the court has granted summary judgment on all of plaintiff's federal claims and declines to exercise supplemental jurisdiction over plaintiff's state law claims. Accordingly, the court dismisses without prejudice plaintiff's remaining state law claims.

**IT IS THEREFORE ORDERED** that defendant GM's Motion for Summary Judgment (Doc. 58) is granted.